PLUMMER, Respondent, v. LEONHARD, Appellant.

*No. 129. Argued October 28, 1969.—Decided November 25, 1969.*
(Also reported in 172 N. W. 2d 1.)

688

For the appellant there were briefs by *Petersen, Sutherland, Axley & Brynelson* and *James C. Herrick,* all of Madison, and oral argument by *Mr. Herrick.*

For the respondent there was a brief by *Jasper, Winner, Perina & Rouse* and *Donald R. McCallum* and *Harry Sauthoff, Jr.,* all of Madison, and oral argument by *Mr. McCallum.*

CONNOR T. HANSEN, J. On appeal, the main argument of defendant centers on two employment "agreements" which were signed in 1965 and 1966. The agreement of January 22, 1965, provides in part:

"THIS AGREEMENT entered into this 22nd day of Jan, 1965, by and between George L. Leonhard of Madison, Wisconsin, hereinafter referred to as 'Employer' and Robert W. Plummer of Madison, Wisconsin, hereinafter referred to as 'Employee.'

" . . . .

"WHEREAS, it is the desire of the parties hereto that the employment relationship of the parties be reduced to writing and that said written contract govern the rights of the parties from and after the date hereinafter provided.

"Now, THEREFORE, in consideration of the mutual covenants herein contained, it is agreed as follows:

"1. All former contracts and agreements both written and oral are abrogated and the parties hereto mutually

release each other from any claim arising out of any previous contracts and this contract shall supersede and release any and all previous contracts.

"2. This agreement shall become effective January 2, 1965, and shall continue until January 2, 1966. However, said contract will be automatically renewed on a one-year basis from year to year from January 2, 1966, unless otherwise terminated as provided for herein."

The agreement of February 1, 1966, was signed by both parties when The Main Agency was sold by appellant to a third party. That agreement provided:

"THIS AGREEMENT entered into this 1st day of February, 1966 by and between George J. Leonhard hereinafter referred to as Leonhard and Robert W. Plummer, hereafter referred to as Plummer.

"WHEREAS the parties hereto have for several years been associated in an insurance agency known as the Main Agency in the City of Madison, Wisconsin with Leonhard as employer and Plummer as employee and,

"WHEREAS the parties have entered into several employment contracts over a period of time and,

"WHEREAS Leonhard has now opportunity to sell said agency and Plummer has opportunity to associate himself with the buyer of said agency and is desirous of seeing such sale consummated and the parties hereto mutually desire to abrogate any contract they might have between them and to mutually release each other from any obligation arising out of said relationship.

"NOW, THEREFORE, IT IS AGREED that in consideration of One Dollar and other valuable consideration and in consideration of the mutual covenants herein contained it is understood and agreed that the total rights of both parties are limited to the settlement provisions for the year 1965 of that certain employment contract between the parties dated January 2, 1965, and that when such settlement has been consummated all contracts and all rights thereunder between the parties are terminated and upon the consummation of such settlement each party hereto mutually and by this instrument releases each other from any claim, action or cause of action that they might have now or in the future arising

out of any of the aforesaid contracts or out of anything in any manner connected with the aforesaid business relationship."

Defendant argues these agreements are releases by which plaintiff relinquished any claim which may have arisen out of the employment or business relationship. Defendant further contends that the January 4, 1962, check from plaintiff to defendant was not a personal loan but a return of an overdraw and is based on the business relationship of the two parties. In support for this proposition, defendant relates evidence brought out during the trial, to wit: (1) The amount of the check, $4,370.40, was based on production figures of The Main Agency for 1961, contained in a letter from defendant to plaintiff and dated December 30, 1961; (2) the only security which plaintiff received for the money was the provisions in the 1962 and 1964 employment contracts which allowed plaintiff certain credits toward the purchase of the business should defendant die; (3) the check was not made out to defendant but to The Main Agency; (4) in his 1961 state and federal income tax returns plaintiff reported $4,370.40 as "Commissions Returned" and reported the difference between $7,200 and $4,370.40, or the sum of $2,829.60 as income for tax purposes; and (5) plaintiff stated, in a deposition, that he would not have made the loan without obtaining a note had it not been for the employment relationship.

Defendant relies principally on the language in the February, 1966 agreement: ". . . or out of anything in any manner connected with the aforesaid business relationship." This broad language is immediately preceded by reference to prior specific employment contracts between the two parties: ". . . arising out of any of the aforesaid contracts. . . ." When limiting language appears in a release and precedes the general and broader words, the specific language will control.

". . . Following a general rule of construction of contracts, . . . it is generally held that general words in a release are to be limited and restricted by particular words in the recital, at least where there is nothing on the face of the instrument, other than general words of release, to show that anything more than the matters particularly specified was intended to be discharged, and where the particular recitals precede the general words; . . . " 76 C. J. S., *Release,* pp. 670, 671, sec. 38.

However, this distinction is not to be observed too rigidly if such a construction would defeat the intent of the parties: "As otherwise stated the rule is that, if an intent to limit the scope of the release appears, it will be restricted to conform to such intent. The foregoing general rule has been said to be merely a rule of construction and not a strict rule of law, and to be inefficacious to control a court as against the obvious intention of the parties." 76 C. J. S., *Release,* p. 671, sec. 38. While great liberality is allowed in construing releases, the operation will be limited to those things within the contemplation of the parties at the time of execution of the release. *See Rensink v. Wallenfang* (1959), 8 Wis. 2d 206, 213, 99 N. W. 2d 196. The determination of intent of the parties to a release, and the scope of a release, is a question of fact for the jury.

"The scope of a release, and the intention of the parties that the release shall cover particular claims, are for the jury or other triers of the facts; but where the facts are undisputed, the scope has been held to be for the court." 76 C. J. S., *Release,* p. 721, sec. 72. [1]

Therefore, the issue is whether the trial court should have taken the question from the jury and ruled as a matter of law that the 1965 and 1966 agreements extinguished plaintiff's claim. We conclude the trial court properly decided the question should be determined by the jury.

---

[1] *See also Doyle v. Teasdale* (1953), 263 Wis. 328, 57 N. W. 2d 381, where the issue of whether a release for personal injuries covered unknown injuries was a question of fact for the jury.

The focal point of the case is what took place between the parties in January of 1962. Plaintiff's evidence at the trial went to establish that the payment to The Main Agency was not a return of an overdraw but wholly a personal loan necessitated by The Main Agency having a bad year financially (1961) and defendant wanting maximum social security benefits which would be possible only if the agency had sufficient draw. If the transaction was a loan and not a return of an overdraw, plaintiff's claim cannot be based on an employment contract since plaintiff had in fact been paid his salary for 1961.

If plaintiff's view is accepted, as it apparently was by the jury, then the evidence put forth by defendant takes on different dimensions. Thus, the fact the check was made to The Main Agency and based on production figures is not inconsistent with a loan designed to give defendant maximum social security benefits based on the draw of the agency and independent of any employment contract. Nor do the statements in plaintiff's 1961 income tax returns demand the conclusion that the transaction was based on an employment contract and was not a loan. Defendant suggests this court hold as a matter of law that such evidence amounts to an admission under oath requiring plaintiff to submit evidence showing the income tax returns to be a mistake. The only authority cited by defendant for this proposition is 1 Jones, *Evidence* (1938 4th ed.), p. 556, sec. 296, which states:

"It is hardly necessary to add that, unless admissions are contractual or unless they constitute an estoppel within some of the rules hereinbefore stated, they are not ordinarily conclusive, but are open to rebuttal or explanation, or to be controlled by higher evidence. Nor does the admission of a party operate to exclude other competent evidence to the same effect. This is true even where the statement has been made under oath—although admissions thus solemnly made are evidence of great weight against the declarant, throwing on him the burden of showing a mistake. . . ."

However, 2 Jones, *Evidence* (1958 5th ed.), p. 739, sec. 397, which covers the same subject matter, makes no mention of any requirement that evidence of mistake must be produced:

"It is hardly necessary to add that, unless admissions are contractual or unless they constitute an estoppel within some of the rules hereinbefore stated, they are not ordinarily conclusive, but are open to rebuttal or explanation, and entitled only to such weight as they deserve to assist the trier of the issues of fact in arriving at the truth. Nor does the admission of a party operate to exclude other competent evidence to the same effect. This is true even where the statement has been made under oath—although admissions thus solemnly made are evidence of great weight against the declarant, placing him under the necessity of producing persuasive evidence to show why he should not be bound by it."

Plaintiff testified that he had filled out the 1961 income tax forms according to defendant's recommendations and plaintiff was instructed to treat the loan as income when it was paid back to him. It is questionable how much relevance the form of reporting taxes has on the nature of a transaction between debtor and creditor, particularly where there is evidence that plaintiff was not knowledgeable in tax matters and relied upon defendant for advice. The defendant has not directed our attention to any authority, nor have we been able to find any, by which this court should hold the declarations in the 1961 tax form conclusive as to the nature and intent of the agreement between the parties. The weight to be given this evidence remained a jury determination.

Finally, plaintiff's statement, on deposition, that he would not have made the loan without a note but for the "employment relationship" does not automatically bring the loan within the language of the 1965 and 1966 releases. It is clear that when plaintiff used this terminology he was referring to an association between the two parties based on the fact they were working together— and not on any strict contractual relationship:

"*Q.* You still haven't got a note from him?

"*A.* No, I am not able to get one.

"*Q.* But the issuance of the check and all the factors that surrounded it arose out of this relationship between you and Leonhard in regard to this insurance business?

"*A.* Well, I can't say affirmative on that, no. That was a condition that existed. He was the sole proprietor. I don't think it was my obligation whether the business at that point made a profit or a loss.

"*Q.* I am not asking you that. But this arose out of your employment relationship, this transaction?

"*A.* Well, obviously to the extent that he would not have asked me for the money had I not been associated with him, that's right.

"*Q.* In other words, you wouldn't go to somebody outside of—to the outside world and give him a check for $4,370 without taking a note?

"*A.* No, sir, I wouldn't.

"*Q.* But you did with him because of the fact that you were employed there, and this failure to do so arose out of this employment relationship, is that right?

"*A.* I was basing our relationship on our initial Exhibit 1, that's correct."

Thus, a jury, finding the intent of the 1965 and 1966 releases was limited to prior employment contracts rather than a "business relationship," could conclude the release of the 1962 loan was not within the scope of these agreements.

Defendant claims error in the trial court's refusal to submit a question on whether or not the loan arose out of the employment relationship. However, the trial court did instruct the jury to answer question 2 of the general verdict "zero" if they found the parties intended by contracts and releases to release defendant from any obligation he might otherwise have on the loan.

" 'The form of the verdict rests in the sound discretion of the trial court, and that discretion will not be interfered with so long as the issues of fact in the case are covered by appropriate questions.' *Ehlers v. Automobile Liability Co.* (1919), 169 Wis. 494, 501, 173 N. W. 325; *Lemke v. Milwaukee E. R. & L. Co.* (1912), 149 Wis.

535, 539, 136 N. W. 286; *Hebbe v. Maple Creek* (1904), 121 Wis. 668, 673, 99 N. W. 442." *Garcia v. Chicago & N. W. Ry.* (1950), 256 Wis. 633, 637, 42 N. W. 2d 288.

In this case we are of the opinion that all the issues were covered by the form of the verdict submitted by the trial court.

*By the Court.*—Judgment affirmed.