Bruce HAMMER and Jacqueline Hammer, Plaintiffs,

v.

ROAD AMERICA, INC.; American Motorcyclist Association, Inc.; Sports Car Club of America, Inc.; and Sports Car Club of America, Inc.—Chicago Region, Defendants.

Civ. A. 84–C–426.

United States District Court, E.D. Wisconsin.

July 31, 1985.

Michael I. Tarnoff, Warshafsky, Rotter, Tarnoff, Gesler & Reinhardt, S.C., Milwaukee, Wis., for plaintiffs.

Thomas Arenz, Frisch, Dudek & Slattery, Milwaukee, Wis., for defendants.

## DECISION and ORDER

TERENCE T. EVANS, District Judge.

On Sunday, May 23, 1982, Bruce Hammer fell from his motorcycle while negotiating a turn during a race at the Road America Race Track, Elkhart Lake, Wisconsin. Hammer, a professional motorcycle racer, was severely injured and rendered paraplegic as a result of the accident.

Hammer and his wife, Jacqueline, have sued the various defendants, those responsible for the race, for negligence. The defendants have moved for summary judgment. They contend that a release signed by Hammer as a prerequisite to joining the American Motorcyclist Association bars him from maintaining this suit. Hammer argues that the release is an exculpatory contract which should not be enforced because it is contrary to public policy and further, that the presence of disputed facts precludes the granting of the defendants' motion.

The release signed by Mr. Hammer is a comprehensive one. If valid, it protects all of the defendants from this suit. By its terms, it purports to release:

The American Motorcyclist Association, the promoters presenting sanctioned events, the owners and lessees of premises on which sanctioned events take place, the participants in sanctioned events, the owners, sponsors and manufacturers of all racing equipment upon the premises, and the officers, directors, officials, representatives, agents and employees of all of them, of and from all liability, loss, claims, demands and possible causes of action that may otherwise accrue from any loss, damage or injury (including death) to my person or property, in any way resulting from, or arising in connection with, or related to, any sanctioned event and whether arising while engaged in competition or in practice or preparation therefore, or while upon, entering or departing from said premises, from any cause whatsoever including without limitation the failure of anyone to enforce rules and regulation [sic] failure to make inspections, or the negligence of other persons.

Mr. Hammer was required to sign this release in order to obtain the professional racing competition license necessary for him to participate in motorcycle races. In addition to the release language quoted above, Hammer also signed an entry form given to him by the American Motorcyclist Association titled "Official Series Entry" in which he applied to race at Elkhart Lake, as well as four other race tracks. This document contained "release and hold-harmless" language similar to that previously quoted.

Lastly, in order to participate in the various weekend racing events at Elkhart Lake on May 22 and 23, 1982, Hammer signed another document which stated:

RELEASE of LIABILITY and ASSUMPTION of RISK is contained in the Application for the Competition License issued to signer hereof.

A preliminary question is presented as to the applicable law in this case. Hammer contends that California law should be applied; however he also asserts that the application of Wisconsin law will lead to an identical result. Defendants argue that

Wisconsin law should apply, with the law of Ohio as an alternative.

Wisconsin and California have similar approaches to the enforceability of exculpatory contracts. Neither state favors contracts which exonerate parties from acts of future negligence. Both hold that such contracts are to be strictly construed. *Arnold v. Shawano County Agr. Society,* 106 Wis.2d 464, 470, 317 N.W.2d 161 (Ct.App. 1982); *Ferrell v. Southern Nevada Off-Road Enthusiasts,* 147 Cal.App.3d 309, 318, 195 Cal.Rptr. 90, 95 (1983). Both also hold that releases will not bar claims that were not within the contemplation of the parties at the time they were executed. 106 Wis.2d at 47, 317 N.W.2d 161; 147 Cal.App.3d at 318, 195 Cal.Rptr. 90. Also, adhesion contracts in which the parties seeking exculpation possess decisively greater bargaining power have been declared unenforceable on public policy grounds in both states. *Discount Fabric House v. Wisconsin Telephone Co.,* 117 Wis.2d 587, 593, 345 N.W.2d 417 (1984), *Graham v. Scissor-Tail, Inc.,* 28 Cal.3d 807, 817, 623 P.2d 165, 171 Cal.Rptr. 604, 610 (1981).

Although no obvious conflict appears between California and Wisconsin law, California appears to have slightly more stringent standards when evaluating the enforceability of contracts. For that reason, I find it necessary to decide which law is applicable to this case.

■ In diversity cases, federal courts are obliged to apply the conflict of law rules of the state in which they sit. *Klaxon Co. v. Stentor Elec. Mfg. Co.,* 313 U.S. 487, 496, 61 S.Ct. 1020, 1021, 85 L.Ed. 1477 (1941). Wisconsin courts use the "dominant interest" approach when determining what law should be applied in a given case. *Zelinger v. State Sand & Gravel Co.,* 38 Wis.2d 98, 105–106, 156 N.W.2d 466 (1968). In choosing the applicable law, five factors are surveyed: the predictability of results, the maintenance of interstate and international order, simplification of the judicial task, advancement of the forum's governmental interest, and the application of the better rule of law.

■ Predictability of results is enhanced when all participants in a race are governed by the same law. Logic would suffer if each participant in a given race were governed, for instance, by the law of his home state—a situation that would lead to different results for persons injured in the same event. The strong interest in predictability may, on its own, support the utilization of Wisconsin law to this case.

The second and third factors, effect upon interstate travel or commerce and simplification of the judicial task, have little relevance here, as this court is equally able to apply Wisconsin, California, or Ohio law. The fourth factor, however, will be furthered by the application of Wisconsin law. Wisconsin courts have historically exhibited concern about incidents occurring within its borders. Moreover, Wisconsin clearly has a governmental interest as to the effect of exculpatory agreements within the state. The last factor, the application of the better rule of law, is too close to call. When all of these factors are considered, however, I believe that Wisconsin law must be applied in this case.

■ The following facts are clear: (1) Mr. Hammer read the release; (2) he does not claim that he misunderstood it or failed to appreciate its import; and, significantly, (3) he does not claim that the type of accident he experienced was outside of his awareness or contemplation when he signed it. These facts distinguish this case from most, if not all, of the cases that have refused to enforce exculpatory contracts.

The risks and hazards of racing are well known. They are a source of the sport's appeal both to racers and spectators. The risks and hazards are consciously borne to attain some other certain benefits, both tangible and intangible. As Hammer explained at his deposition:

Racers are well aware what the potential for danger or potential injury. We're all optimists and have high regard for our skills and control over the situation, so I

would state that I was well aware of the potential for injuries, and that I considered the potential many times, but I—and I knew of racers that had died as a result of racing injuries, but what all racers do, and what I did is examine the circumstances of their death say, well, that won't happen to me, because they made a mistake or something like that.

It is important to note here that Bruce Hammer was injured while negotiating a turn—the touchstone of the sport of racing. The most exciting part of any race (except a straight one) is the turn, and the sharper the better. That's why the thrills of sports from cycle racing to bobsledding are intensified in direct proportion to the "danger" of the curve.

The object of the race is to cover the distance as fast as possible. Certainly, a racer will increase his safety if he slows down in the turn. A racer, however, will try, if he wants to do well, to take the turn as fast as he can without losing control of his cycle. The closer he gets to the danger point the better will be his performance, but the greater will be his risk. Therein lies the allure of racing.

Bruce Hammer voluntarily, knowingly and expressly chose to confront the risks and to bear their potential costs. No public policy prohibited him from doing so, and no public policy precludes this court from giving effect to his written promise not to hold these defendants responsible should he be overcome by the hazards of his chosen sport.

I turn now to the law and note that most jurisdictions routinely enforce exculpatory agreements in the racing context. *See e.g., Trumbower v. Sports Car Club of America, Inc.,* 428 F.Supp. 1113 (W.D.Okla. 1976); *Gore v. Tri-County Raceway, Inc.,* 407 F.Supp. 489 (M.D.Ala.1974); *LaFrenz v. Lake County Fair Board,* 172 Ind.App. 389, 360 N.E.2d 605 (1977); *Schlessmann v. Henson,* 83 Ill.2d 82, 46 Ill.Dec. 139, 413 N.E.2d 1252 (1980); *Morrow v. Auto Championship Racing Ass'n,* 8 Ill.App.3d 682, 291 N.E.2d 30 (1972); *Winterstein v. Wilcom,* 16 Md.App. 130, 293 A.2d 821 (1972); *Lee v. Allied Sports Association, Inc.,* 349 Mass. 544, 209 N.E.2d 329 (1965); *Theroux v. Kedenberg Racing Assoc.,* 50 Misc.2d 97, 269 N.Y.S.2d 789 (1965); *Corpus Christi Speedway v. Morton,* 279 S.W.2d 903 (Tex.Civ.App.1955).

The most recent statement of Wisconsin law regarding the effect of exculpatory agreements in the context of racing events is in the Wisconsin Supreme Court decision of *Arnold, et al. v. Shawano County Agricultural Society, et al.,* 111 Wis.2d 203, 330 N.W.2d 773 (1983), and the Court of Appeals decision in the same case, *Arnold, et al. v. Shawano County Agricultural Society, et al.,* 106 Wis.2d 464, 317 N.W.2d 161 (1981). These decisions held that while exculpatory agreements are subject to close scrutiny and are to be strictly construed, they are enforceable in Wisconsin.

In *Arnold,* the Wisconsin Supreme Court made clear that the touchstone for analysis of exculpatory agreements was the "contemplation of the parties when the contract was executed." *Id.,* 111 Wis.2d at 211, 330 N.W.2d 773. In order for the exculpatory contract to be enforced, it is necessary that "the contract clearly expresses the intent of the parties so that with the surrounding circumstances, it is clear the parties knowingly agreed to excuse one of them from otherwise responsible acts." *Id.* at 213, 330 N.W.2d 773.

The *Arnold* decisions envision that summary judgment would be appropriate in many cases involving releases in the racing context. In citing language from *Plummer v. Leonhard,* 44 Wis.2d 686, 692, 172 N.W.2d 1 (1969), the court noted that "where the facts are undisputed, the scope [of the exculpatory contract] has been held to be for the court." *Id.,* 111 Wis.2d at 212, 330 N.W.2d 773.

An application of *Arnold, supra,* requires an examination of its facts. Leroy J. Arnold was injured in a stock car race at the Shawano County Fairgrounds. His car crashed through a guardrail, left the track, and then ran into a utility pole and lumber pile outside the race track. His car then caught fire, and race track personnel used

chemical extinguishers in an attempt to put it out while Arnold was still in the car. Arnold contended that he sustained brain damage as a result of the rescue operation in combination with the "toxic effects" of the fire extinguishing chemicals.

On these facts, the Court of Appeals held that the trial court had properly granted summary judgment with regard to Arnold's principal allegations. The Court of Appeals held, 106 Wis.2d at 471, 317 N.W.2d 161:

> We also conclude that LeRoy's [Arnold's] allegations that the defendants were negligent in maintaining the racetrack's surface, its guardrail, and the area adjacent to the track were properly resolved by summary judgment. The language of the release clearly indicates an intent by the parties to relieve the defendants of liability for injuries resulting from a broad range of accidents that occur in auto races.

The Supreme Court did not disturb this finding when it held that the Shawano County Agricultural Society was entitled to partial summary judgment. Indeed, the Supreme Court noted, at 212:

> The exculpatory contract states that it covers any loss, liability or damages whether caused by the negligence of releasees or otherwise. This language is not free of ambiguity. While it would be reasonable to assume that this exculpatory contract was intended to preclude liability for such things as negligent maintenance of the track or the negligent driving of another driver participant, we cannot conclude that this contract was meant to cover negligent rescue operations.

In this case, Mr. Hammer's tragic accident cannot be meaningfully distinguished from the situations discussed by both the Court of Appeals and the Supreme Court as being appropriate for summary judgment.

The Wisconsin Supreme Court held additionally that there were two material issues of disputed facts making summary judgment on all of plaintiff's claims inappropriate. The first was whether the injuries from the toxic chemicals claimed to constitute negligent rescue and occurring off the track were within the contemplation of the parties when the release was signed. The second disputed issue of fact related to a qualification in the release itself that limited the release's effect to a "Restricted Area" within the track. The driver and his car left the Restricted Area and also left the race track property and ended up in a nearby lumber yard, where he was sprayed with the fire extinguishing chemicals. The court held that it was not clear whether the release was meant to encompass conduct outside both the restricted area and the track where the fire was extinguished. Factual issues like these are not presented in this case, where only general "safe place" type allegations are made.

In this case, Mr. Hammer fell off from his motorcycle and slid into a protective barrier along the side of the track. He did not leave the track. There was nothing about this accident that was not in the reasonable contemplation of the parties when the exculpatory agreement was signed. Clearly, this accident was the type contemplated by the release.

It is also worthy of note that the Wisconsin Supreme Court observed (*Id.*, 111 Wis.2d at 213, 330 N.W.2d 773, Note 4) that its decision in *Arnold* was "consistent" with decisions of other courts in other jurisdictions with regard to the requirement that the intent of the parties to the exculpatory contract must be carefully examined. An examination of the cases cited by the Supreme Court discloses that in each judgment was granted for the defense on the issue of the applicability of an exculpatory contract.

Lastly, it should be noted that in addition to exculpatory language, the agreement here also contains an express assumption of risk by Hammer. Under Wisconsin law, the defense of assumption of risk still applies to situations where there is a consensual relationship between the defendant and the plaintiff. *Switzer v. Weiner*, 230 Wis. 599, 603, 284 N.W. 509 (1939). *See*

*also, Polsky v. Levine,* 73 Wis.2d 547, 552, 243 N.W.2d 503 (1976).

The defense of express assumption of risk is described in § 496B, *Restatement (Second) of Torts:*

> A plaintiff, who by contract or otherwise expressly agrees to accept a risk of harm arising from the defendants' negligence or reckless conduct cannot recover for such harm, unless the agreement is invalid as contrary to public policy.

The defense is particularly appropriate here in light of Mr. Hammer's deposition testimony, which leaves no doubt that he had gained a thorough appreciation of the risks associated with motorcycle racing over a period of at least a decade, and agreed to assume those risks. The assumption of risk language is explicit. Plaintiff's testimony that he understood the language is unequivocal. There simply is no reason to be found in Wisconsin law or public policy why effect should not be given to Bruce Hammer's promise to assume the risk of motorcycle racing.

This, of course, is not a happy result. One would like to see Mr. Hammer fully compensated for his disabling injury. Motorcycle racers like him would be better served in the future, however, by having adequate disability and life insurance contracts in force either personally or through their professional groups. Not to do so leaves them out in the cold, as an exculpatory release like the one present here is harder to successfully negotiate around than the most difficult of hairpin turns.

The defendants' motion for summary judgment is GRANTED. The claim of Bruce Hammer is DISMISSED.

The result reached here leaves alive only the claim of Jacqueline Hammer for loss of consortium. Her claim, of course, is a separate cause of action. *Schwartz v. Milwaukee,* 54 Wis.2d 286, 293, 195 N.W.2d 480 (1972). I am aware of how the loss of consortium claim was considered by the Wisconsin courts in the two *Arnold* decisions, see 106 Wis.2d 464, 469, 317 N.W.2d 161, and 111 Wis.2d 203, 214, 330 N.W.2d 773. Under the facts of this case, however, Jacqueline Hammer's claim may no longer be viable.

As previously noted, Bruce Hammer did more than just release these defendants from liability for their negligent acts when he signed his application for a competitive racing license. He also expressly assumed the risk of injury. The agreement that he signed states:

> I know the risk and danger to myself and property while upon said premises or while participating or assisting in a sanctioned event, and I do so voluntarily and in reliance, not upon the property, equipment, facilities and existing conditions furnished by others, but upon my own judgment and ability, and I thereby assume all risk for loss, damage or injury (including death) to myself and my property from any cause whatsoever and whether or not attributable to the negligence of others.

The defense of contributory negligence on the part of Bruce Hammer would be a valid defense to the claim of his wife. By signing the release, Bruce Hammer expressly assumed the risk of injury and, by participating in the race, he undoubtedly is susceptible to a finding of contributory negligence. Although the continued vitality of Jacqueline's claim is not formally before me, I believe it should be addressed soon, and I direct that the parties be prepared to discuss it at a status conference in this case to be conducted on September 3, 1985, at 8:30 a.m.